UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| KIOSK PROMOTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 19-cv-01847 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| TEXAS WIZ, LLC, | ) | |
| ALEXANDER GREGORY and | ) | |
| JHONNY DONNELLY a/k/a | ) | |
| JOHNNY DONNELLY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case arises out of the breakdown of the business relationship between Kiosk Promotions and Texas Wiz.[1] R. 1, Compl.[2] The plan was to set up electronic "sweepstakes" machines around Chicago; Kiosk would supply the machines, while Texas Wiz would supply the software for the machines. About two years into the relationship, though, Texas Wiz cut off Kiosk's access to the software, which left Kiosk's machines inoperable. Kiosk is now suing Texas Wiz for breach of contract, tortious interference with contract, tortious interference with prospective economic advantage, breach of fiduciary duty, and various forms of injunctive relief. The Defendants (which include Texas Wiz and its two members, Alexander Gregory and

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1332. Complete diversity exists between Kiosk and each Defendant: whereas Kiosk is an Illinois citizen, Texas Wiz and Donnelly are both citizens of Texas, and Gregory is a citizen of New York. The amount in controversy exceeds $75,000.

[2]Citations to the docket are indicated by "R." followed by the docket entry.

Johnny Donnelly) have moved to dismiss all of the claims. R. 23. For the reasons explained below, the motion to dismiss is granted in large part and denied in very limited part.

**I. Background**

For purposes of this motion, the Court accepts as true the factual allegations in the Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The parties operate in the "fledgling" industry of "sweepstakes" machines. Compl. ¶ 12. Sweepstakes machines are physical game terminals installed in various locations (like gas stations and bars) that allow customers to play casino-style computer games for prizes. *Id*. In 2016, Alexander Gregory (Texas Wiz's proprietor) approached Thomas Perez (Kiosk's owner) with a business proposal involving sweepstakes machines. Gregory had connections with a Russian company named Inbet, which produced gaming software used to operate sweepstakes machines. *Id*. ¶¶ 10-11. Perez, for his part, had "over 50 years of experience in placing coin operated amusement devices in taverns, restaurants and other businesses." *Id*. ¶ 8.

In connection with this business endeavor, Gregory and Perez both formed their own companies. In June 2016, Perez created Kiosk Promotions, Inc., and a few months later, Gregory set up Texas Wiz, LLC. Compl. ¶¶ 13-14. The managing members of Texas Wiz were listed as Gregory and another individual named Johnny Donnelly.[3] *Id*. ¶ 3.

---

[3]Johnny Donnelly apparently appears on some documents as "Johnny" Donnelly and other documents as "Jhonny" Donnelly. *See* Compl. ¶ 9.

2

According to Kiosk, Perez (acting as an agent for Kiosk) and Gregory (acting as an agent for Texas Wiz) entered into a contract governing a number of topics related to their sweepstakes-machine plan. Compl. ¶ 15. The gist of the agreement was that Kiosk would use its "vast" customer base (namely, gas stations, taverns, and similar locations) to place physical sweepstakes machines into those third-party locations, and Texas Wiz would use its connections with Inbet to provide the actual gaming software. *Id*. The parties would then split the proceeds from the machines (minus any prize money doled out to customers, of course). *Id*. The agreement was entirely oral. *Id*. ¶ 58.

Specifically, some relevant terms of the agreement are as follows. First, as mentioned above, Texas Wiz agreed to provide Inbet-gaming software for use in the Kiosk machines. Compl. ¶ 15. (The exact mechanism by which the software was loaded onto the machines is not clear, but that is not important right now.) In addition to the software, Texas Wiz also agreed to provide Kiosk with modems for the machines as well as access to a chat room in which Kiosk representatives could communicate with Inbet representatives for help with software adjustments. *Id*. In exchange, Kiosk agreed to enter into agreements with "its vast network of customers" to place sweepstakes machines into establishments like gas stations and bars. *Id*. Kiosk also agreed to build and service the machines. In terms of revenue-sharing, Kiosk agreed to pay Texas Wiz 10% of all revenues collected from the machines. *Id*. Kiosk would split the remaining 90% of revenues with the third-party business owners that hosted the machines on their premises. *Id*. According to Kiosk, the

payments to Texas Wiz were made on a monthly basis and ultimately totaled roughly $400,000 over the course of the relationship. *Id.* ¶¶ 15, 19.

All in all, Kiosk alleges that it invested between $600,000 and $700,000 into assembling the physical sweepstakes machines, as well as thousands of dollars in compensating sales representatives to help place the machines into local establishments. Compl. ¶¶ 16-17. Kiosk estimates that it placed about 300 machines total throughout the Chicago area. *Id.* ¶ 36. But all of these investments went to waste, argues Kiosk, when Texas Wiz allegedly breached the contract in 2018. The breach was apparently triggered by a dispute in the summer of 2018, although the details of what sparked the breakdown are unclear. According to Kiosk, "Gregory claimed Kiosk solicited a location that previously had sweepstakes machines … that were operated using Inbet software." Compl. ¶ 20. This was apparently incorrect, according to Kiosk, because there were no machines at that location at the time of Kiosk's solicitation. *Id.*

In any event, following that incident, Texas Wiz began to ask for its 10% payment every week instead of every month. Compl. ¶ 21. Texas Wiz also started to periodically "shut down" the software on the Kiosk machines and also stopped supplying modems to Kiosk. *Id.* ¶ 22. In addition, Kiosk asserts that Texas Wiz "drastically cut the number of free play coupons" that it sent Kiosk; those coupons were crucial, argues Kiosk, in encouraging customers to play the machines. *Id.* ¶ 24.

Then, at some point in early March 2019, Texas Wiz sent Kiosk a written proposal modifying the terms of the original oral agreement. Compl. ¶ 26. In

4

particular, the new written proposal asked Kiosk to pay various fees for machine setup, licensing, data processing, login, and technical services, instead of the original 10% in shared revenue that the parties agreed to in 2016. *Id*.

The dispute escalated on March 12, 2019, when Texas Wiz informed Kiosk that it would shut down all Kiosk machines (presumably by blocking access to the Inbet software), and indeed, Texas Wiz did so a few days later. Compl. ¶¶ 29-30. Along with shutting down Kiosk's machines, Texas Wiz also caused the machines to display "its telephone number (1-800-768-9108) on all of Kiosk's machines." *Id*. ¶ 31. When third-party location managers called that number, they were apparently told that Kiosk "did not properly pay Texas Wiz and that Texas Wiz will have new equipment installed in the location." *Id*. ¶ 32. Through those tactics, Kiosk argues, Texas Wiz has "effectively put Kiosk out of business" and has co-opted Kiosk's relationships with location owners for its own use. *Id*. ¶ 33.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[4] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

5

intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

#### A. Breach of Contract (Count 1)

Kiosk first argues that Texas Wiz breached its contract to "provide software necessary to operate Plaintiff's sweepstakes machines in exchange for 10% of the net revenues generated by the machines." Compl. ¶ 35. According to Kiosk, the breach occurred when Texas Wiz "turn[ed] off the software to all of Kiosk's equipment, which total approximately 300 machines." *Id.* ¶ 36. In response, Texas Wiz points out that the parties never came to any agreement on the *duration* of the contract. R. 24, Defs.' Br. at 24. Because there was no end date to the contract, argues Texas Wiz, the

6

agreement was thus terminable at will, so shutting down Kiosk's access to the sweepstakes software could not have constituted a breach. *Id*.

Texas Wiz is correct. Under Illinois law, contracts of indefinite duration are generally terminable at will by either party. *Jespersen v. Minn. Mining & Mfg. Co.*, 700 N.E.2d 1014, 1015 (Ill. 1998). True, parties can always contract around this presumption; for example, they can include a provision that the agreement terminates only when some time expires or a specific event happens. *Id*. at 1016. But nothing of that sort is alleged here. Even accepting all of Kiosk's allegations as true, the parties did not agree to any specific end date for the relationship, nor did they agree on any contractual protections against unilateral actions by one of the parties, as Texas Wiz did here. So, the breach of contract claim is dismissed.

### B. Tortious Interference (Counts 2 and 3)

Kiosk also asserts two tortious interference claims against Texas Wiz: tortious interference with contract (Count 2) and tortious interference with prospective economic advantage (Count 3). Unlike the breach of contract claim, which targeted the relationship between Kiosk and Texas Wiz, both of the tortious interference claims are premised on the theory that Texas Wiz interfered with Kiosk's relationships with the third-party establishments in which Kiosk placed its sweepstakes machines. Each claim will be addressed in turn.

### 1. Tortious Interference with Contract

Addressing the claim for tortious interference with contract first, Kiosk must allege (1) the existence of a valid and enforceable contract between it and a third party; (2) Texas Wiz's awareness of the contract; (3) Texas Wiz's intentional and unjustified inducement of a breach of that contract; (4) a subsequent breach of the contract by the third party caused by Texas Wiz's conduct; and (5) damages. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989).

Here, Kiosk alleges that Texas Wiz was "aware" that Kiosk "had valid and enforceable contracts with third[-]party businesses for the placement of its sweepstakes equipment." Compl. ¶ 40. Kiosk then alleges that by "intentionally and without legal jurisdiction shutting down" Kiosk's machines, Texas Wiz caused Kiosk to lose "several" of those third-party contracts. *Id.* ¶ 41. In response, Texas Wiz points out that Kiosk has not yet alleged that any of the third-party business owners actually breached their contracts with Kiosk. Defs.' Br. at 4. Again, Texas Wiz is correct, and the tortious interference with contract claim must be dismissed. Kiosk has not alleged any facts remotely describing the contracts it had with the third-party locations that hosted the Kiosk machines. There is no suggestion, for instance, that the decisions of the third-party business owners to terminate their relationships with Kiosk in fact rise to the level of a breach of contract. This is especially true if those contracts were *also* of indefinite duration—it is hard to see how terminating a terminable-at-will contract could constitute a "breach" for purposes of a tortious interference with contract claim.

But even if Kiosk had successfully alleged that the third-party contracts had been breached, Kiosk would still have to show that Texas Wiz's actions were "unjustified." As explained earlier in the Opinion, however, to the extent that this claim centers on Texas Wiz's removal of the Inbet software from Kiosk's machines, that in itself is not "unjustified" because Texas Wiz was merely exercising its right to terminate an at-will contract. Thus, the tortious interference with contract claim is dismissed.

### 2. Tortious Interference with Prospective Economic Advantage

On the other hand, the prospective economic advantage claim does not require Kiosk to prove a breach of any of its third-party contracts. Rather, Kiosk must only allege (1) a reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference. *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991). The Illinois Supreme Court has clarified that "the absence of an enforceable contract does not bar recovery" where "the gravamen of the charge is interference with an existing relationship." *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 370 (Ill. 1998).

Here, too, Kiosk begins by alleging that Texas Wiz knew that Kiosk "had valid and enforceable contracts with third party businesses for the placement of its sweepstakes equipment." Compl. ¶ 43. But the precise claim now is that Texas Wiz "intentionally and unjustifiably induced multiple third parties to terminate their

9

agreements with" Kiosk. *Id*. ¶ 45. Specifically, Kiosk argues that Texas Wiz "shut down [Kiosk's] equipment at the third-party locations and then solicited those third parties with the very same equipment operated by Kiosk, just with other vendors." R. 29, Pl.'s Resp. Br. at 8. As explained above, Texas Wiz's action of shutting down the Kiosk equipment does not constitute wrongful conduct, and Kiosk did not have a "legitimate expectancy" to keep operating its machines using Texas Wiz's software.

But the 1-800 telephone number that Texas Wiz displayed on Kiosk's machines is a different story. Here, Texas Wiz cannot claim (at least at the pleading stage) that it was justified in placing its phone number on Kiosk's machines after it had unilaterally ended the relationship. Accepting the Complaint's allegations as true, that action went far beyond simply exercising Texas Wiz's right to terminate the at-will contract. So, even though the removal of the Inbet software from Kiosk's machines is not a valid basis for the tortious interference claim, Texas Wiz's appropriation of Kiosk's machines to broadcast negative information about Kiosk (regardless of whether the information was true or not) and to solicit business on behalf of a different vendor *does* form a valid basis for Kiosk's tortious interference claim.

Applying the *Fellhauer* elements, Kiosk has alleged a reasonable expectation of entering into a valid (continued) business relationship with the various third-party locations in which its machines were located. For instance, Kiosk could have potentially sought replacement software for its machines, thereby preserving its relationships with the gas stations and taverns at issue. Second, Kiosk has alleged

10

that Texas Wiz knew about its relationships with the third-party locations. As discussed above, Texas Wiz's act of placing its telephone number on Kiosk's machines constitutes purposeful interference that plausibly cut short Kiosk's relationships with the locations. One could imagine one of the business owners remaining unfazed by the sudden shutdown of Kiosk's machines, but then calling the 1-800 number, discovering that Kiosk had failed to pay Texas Wiz, and deciding to terminate their own relationship with Kiosk on *that* basis. And finally, Kiosk has alleged damages in the form of lost revenue from the discontinuation of these relationships. So, this claim survives, limited as it is.

One final point though: Kiosk should be aware that as a practical matter, this narrow claim may be difficult and burdensome to prove—Kiosk will likely need to conduct an enormous amount of non-party discovery to determine whether the third-party locations (1) would not have terminated their relationship with Kiosk simply by virtue of Texas Wiz removing the software *and* (2) actually called the 1-800 number and terminated the relationship on that exact basis. Put another way, the discovery burden in pursuing this claim will probably be enormously one-sided; Kiosk and its former clients will bear most of the costs, so whether this limited claim is worth the expense deserves sober consideration. But for now, Kiosk's claim for tortious interference with prospective economic advantage survives—though only on the narrow allegations involving Texas Wiz's improper placement of the 1-800 number on Kiosk's machines.

### C. Remaining Counts (Counts 4-6)

Finally, Kiosk brings two claims for breach of fiduciary duty rooted in the implied duty of good faith and fair dealing in "any contract" (Count 4), as well as in "any joint venture" (Count 5). Compl. ¶¶ 39, 42. But Kiosk concedes in its response brief that there was no fiduciary relationship between Kiosk and Texas Wiz, Pl.'s Resp. Br. at 11, so these claims are both dismissed.

Kiosk also seeks injunctive relief, both preliminary and general, Compl. ¶ 69, but concedes that the Court previously declined to issue injunctive relief.[5] Pl.'s Resp. Br. at 11. So that claim (Count 6) is also dismissed.

### IV. Conclusion

For the reasons discussed above, the motion to dismiss is granted in large part and denied in limited part. Kiosk's breach of fiduciary duty claims (Counts 4-5) and request for injunctive relief (Count 6) are dismissed with prejudice. But the dismissals of the breach of contract and tortious interference with contract claims (Counts 1-2) are without prejudice, so Kiosk may file an amended complaint by April 24, 2020 (although it is difficult to conceive of how Kiosk might fix the deficiencies highlighted in this Opinion). The tortious interference with prospective economic

---

[5]Kiosk separately filed a motion for a temporary restraining order and preliminary injunction. R. 5. On April 17, 2019, the Court denied the motion in large part but granted it as to Texas Wiz's display of the 1-800 number on Kiosk's machines. R. 22. Texas Wiz was ordered to remove the phone number display from Kiosk's machines. *Id*.

advantage claim (Count 3) survives for now. The status hearing of April 7, 2020 is reset to April 28, 2020, at 11 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 22, 2020